MARY SAWYER WEAVER, ADMINISTRATRIX OF THE ESTATE OF JACKIE WEAVER v. R. J. BENNETT AND WELDON O. PARRISH.

(Filed 6 March 1963.)

**1. Negligence §§ 24a, 26—**

Evidence that the operator of a Unit Backhoe which ran on caterpillar tractors, backed the machinery while his view of the area immediately to the rear of the machinery was blocked by its platform, without first seeing that the movement could be made in safety, resulting in injury to a workman whose leg was caught under the treads, *held* sufficient to be submitted to the jury on the issue of negligence of the operator of the machinery and not to show contributory negligence as a matter of law on the part of the workman.

**2. Appeal and Error § 1—**

Where a subsequent trial is necessary, the Supreme Court will refrain from discussing the evidence further than is necessary to explain the conclusions reached.

**3. Master and Servant § 7—**

When one employer lends or hires machinery with an operator to another, which of the two employers is the superior in the performance of

the work by the employee must be determined upon the facts of each particular case, and factors to be considered are whether the general employer retains the right to hire and fire, whether the general employer is in the business of lending equipment with workmen to operate it, and whether the general employer retains control of the manner of performing the work as distinguished from merely pointing out the place where and the time when the work should be performed.

**4. Master and Servant § 86—**

An employee whose injuries are compensable under the Workmen's Compensation Act may not maintain an action against a fellow employee to recover for such fellow employee's negligence in causing the injury, and the factor determinative of whether the tort-feasor is a fellow employee or a third person tort-feasor is whether he is conducting the business of the common employer at the time of the negligent act inflicting injury.

**5. Same— Evidence held not to show affirmatively that operator of rented machinery was fellow employee.**

The evidence tended to show that a person in the business of renting heavy machinery with skilled operators rented a Unit Backhoe to the employer of plaintiff's intestate, that he retained the sole right to hire and fire the operators of the machinery, and that intestate's employer directed the operator concerning the work to be done but not the manner of performing it. The evidence further tended to show that the operator of the Backhoe suddenly backed the machinery while his view of the area immediately to the rear of the machinery was blocked by its platform, resulting in injury to intestate whose leg was caught under the treads. *Held:* The evidence does not affirmatively disclose that at the time of the injury the operator of the machinery was conducting the business of the specific employer within the meaning of G.S. 97-9 and nonsuit was erroneously entered in plaintiff's action at common law against the operator of the Backhoe and the lessor thereof.

APPEAL by plaintiff from *Gwyn, J.,* January 22, 1962, Term of FORSYTH, docketed and argued as No. 388 at Fall Term 1962.

The administratrix of Jackie Weaver, deceased, instituted this action to recover damages for the death of her intestate and the pain and suffering and expenses incurred between injury and death.

Weaver, then twenty-six years old, was fatally injured October 17, 1958, when a portion of his body was caught and crushed by a piece of heavy ditch digging equipment known as a Unit Backhoe. Defendant Bennett was the owner, and defendant Parrish was the operator, of the Unit Backhoe.

There was evidence tending to show the facts narrated below.

The fatal accident occurred in Stokes County, North Carolina, where R. J. Reynolds Tobacco Company was engaged in constructing its Brook Cove storage plant. Reynolds had rented the Unit Backhoe

(also other equipment) from Bennett, the owner, under a written contract in which Bennett agreed to furnish all fuel and a competent operator. For the use of this equipment and fuel therefor and the services of the operator, Reynolds agreed to pay Bennett a stipulated amount ($12.00) per hour.

Weaver, employed by Reynolds as a pipe fitter's helper, was a member of a pipe laying crew of five, of which Gilmer Sisk was foreman, all employees of Reynolds. Since June, 1958, the Unit Backhoe, with Parrish as operator, had worked with the Sisk crew in laying water and sewer pipes.

The Sisk crew worked under the supervision of Sherrell Dean Wood, employed by Reynolds as foreman of the pipe shop. Wood showed Parrish where he wanted a ditch dug, how wide, how deep, etc., but gave Parish no instructions as to the operation of the Unit Backhoe.

The Unit Backhoe weighs "about 19 tons." It travels on (two) tracks consisting of metal tank-type treads. The operator's cab and the diesel motor are on a platform over said tracks. A boom some fourteen feet long with a digging bucket on the end extends in front of the platform. The entire platform can be turned 360 degrees in either direction.

The Unit Backhoe, when moving on its tracks, has only one speed, approximately one mile per hour. It starts with a jerk from a standstill to that speed. When engaged in digging operations, the machine is standing still on its tracks. In the process of digging, the bucket is lowered and pulled toward the machine. Then the bucket is raised and swung by the boom to the place where its contents are released. The machine moves *on its tracks* only when being moved to a new position to resume digging operations or to a different site.

Prior to Weaver's fatal injury the Unit Backhoe was standing still. The platform and the boom in front were turned to the operator's right at a 45-degree angle. A keg (cooler) containing drinking water for the workmen was on the platform at the right rear. In the machine's then position, the right rear of the platform was over the rear of the left track. When the platform was so turned, the operator could not see the portion thereof where the water keg was sitting. In backing to a new position, the operator had a clear view in the direction of travel only when the platform and boom were turned to the right or left approximately at a 90-degree angle.

On October 17, 1958, the Sisk crew was engaged in laying fire protection water lines. The ditch for the pipeline was being dug in an open field. No other crew was working within three hundred yards of where the Sisk crew was working. Starting work at 7:30 a.m., the Sisk crew

had laid two lengths of pipe. Sisk and Weaver had been in the ditch. Weaver came out of the ditch, passed two other members of the Sisk crew and walked by the Unit Backhoe. Shortly thereafter, and before the Sisk crew had started back to work, the Unit Backhoe, without signal or warning of any kind, "started moving," backing. Weaver's leg was caught under the treads of the left track. In response to cries from members of the Sisk crew, Parrish stopped the machine. He then moved it forward, thereby releasing Weaver.

Other evidential facts will be set forth in the opinion.

Plaintiff alleged her intestate's injury and death were proximately caused by the negligence of Parrish when acting as an employee of Bennett and within the course and scope of his employment by him.

Answering, defendants denied negligence and pleaded as further defenses: (1) Plaintiff's intestate was contributorily negligent. (2) Weaver and Reynolds were subject to and bound by the provisions of the Workmen's Compensation Act; that plaintiff had been paid full compensation as provided therein; and that Parrish, on the occasion of Weaver's fatal injuries, was acting as agent, servant and employee of Reynolds and was conducting the business of Reynolds and therefore was immune from suit under the provisions of G.S. 97-9. (3) In any event, neither Reynolds nor its insurance carrier is entitled to enforce subrogation on account of their payment of compensation because Parrish was acting under the supervision and direction of the officers and supervisors of Reynolds.

At the conclusion of plaintiff's evidence, the court, allowing defendants' motion therefor, entered judgment of involuntary nonsuit. Plaintiff excepted and appealed.

*Deal, Hutchins & Minor and W. Scott Buck for plaintiff appellant.*
*Hudson, Ferrell, Petree, Stockton, Stockton & Robinson for defendant appellees.*

BOBBITT, J. Careful consideration impels the conclusion that the evidence, when considered in the light most favorable to plaintiff, is sufficient to require submission for jury determination of issues as to the alleged negligence of Parrish and as to the alleged contributory negligence of Weaver. Having reached this conclusion, we deem it appropriate to refrain from further discussion of the evidence (relevant to said issues) presently before us. *Tucker v. Moorefield,* 250 N.C. 340, 342, 108 S.E. 2d 637, and cases cited.

Even so, defendants contend that, under the provisions of G.S. 97-9 and G.S. 97-10, plaintiff's *exclusive* remedy is against her in-

testate's employer and its insurance carrier for compensation as provided in our Workmen's Compensation Act and Parrish is immune from suit.

In this jurisdiction, an employee subject to the provisions of our Workmen's Compensation Act, "whose injury arose out of and in the course of his employment, cannot maintain an action at common law against his co-employee whose negligence caused the injury." *Warner v. Leder,* 234 N.C. 727, 732, 69 S.E. 2d 6; *Bass v. Ingold,* 232 N.C. 295, 60 S.E. 2d 114; *Essick v. Lexington,* 232 N.C. 200, 60 S.E. 2d 106. In *Warner,* the factual situation in each pertinent prior decision is discussed.

In *Warner,* this Court, in opinion by *Denny, J.,* (now C.J.), said: "We hold that an officer or agent of a corporation who is acting within the scope of his authority for and on behalf of the corporation, and whose acts are such as to render the corporation liable therefor, is among those conducting the business of the corporation, within the purview of G.S. 97-9, and entitled to the immunity it gives; (citations) and that the provision in G.S. 97-10 which gives the injured employee or his personal representative 'a right to recover damages for such injury, loss of service, or death from any person other than the employer,' means any other person or party who is a stranger to the employment but whose negligence contributed to the injury. And we further hold that such provision does not authorize the injured employee to maintain an action at common law against those conducting the business of the employer whose negligence caused the injury. To hold otherwise would, in a large measure, defeat the very purposes for which our Workmen's Compensation Act was enacted. Instead of transferring from the worker to the industry, or business in which he is employed, and ultimately to the consuming public, a greater proportion of the economic loss due to accidents sustained by him arising out of and in the course of his employment, we would, under the provisions for subrogation contained in our Workmen's Compensation Act, G.S. 97-10, transfer this burden to those conducting the business of the employer to the extent of their solvency. The Legislature never intended that officers, agents, and employees conducting the business of the employer, should so underwrite this economic loss."

Under *our* Workmen's Compensation Act, as held in the cited decisions, where an employee's injury or death is compensable the sole remedy against the employer and "those conducting his business" (G.S. 97-9) is that provided by its terms. As noted in *Warner,* in jurisdictions where the Workmen's Compensation Act does not contain a similar immunity clause, fellow workmen are generally treated as

third parties within the meaning of the Act. See 30 N.C.L.R. 474. Thus, in *Nepstad v. Lambert* (Minn.), 50 N.W. 2d 614, 624, discussed below, this statement appears: "It is clear under the Wisconsin law that if one co-employe negligently injurers his fellow employe it is no defense in a suit against him to assert that both were employed under one master."

The rule stated in *Warner* has been applied and recognized in subsequent decisions: *McNair v. Ward*, 240 N.C. 330, 82 S.E. 2d 85; *Johnson v. Catlett*, 246 N.C. 341, 98 S.E. 2d 458; *Wesley v. Lea*, 252 N.C. 540, 114 S.E. 2d 350; *Jackson v. Bobbitt*, 253 N.C. 670, 117 S.E. 2d 806. In each prior decision based on the rule stated in *Warner*, the person who was conducting the employer's business and whose negligence caused the injury was an officer or otherwise in the general employment of the employer of the injured person.

This question is presented: Does the evidence, when considered in the light most favorable to plaintiff, disclose affirmatively that Parrish, at the time Weaver was fatally injured, was *conducting the business* of Reynolds within the meaning of G.S. 97-9 and therefore, under the provisions of our Workmen's Compensation Act, immune from suit? The alleged liability of Bennett, if any, rests solely on the doctrine of *respondeat superior*.

It is noted: The record contains no evidence or stipulation that Weaver and Reynolds on October 17, 1958, were subject to and bound by the provisions of our Workmen's Compensation Act and that plaintiff has been paid full compensation in accordance with its terms. However, since these facts underlie contentions advanced by both plaintiff and defendants in their briefs, our further discussion assumes the existence of such facts.

Pertinent evidential facts are as follows:

The Unit Backhoe was one of some twenty pieces of equipment covered by a "purchase order" dated June 18, 1958, from Reynolds to Bennett. By its terms, Bennett agreed to furnish the equipment listed therein at locations in Forsyth and Stokes Counties specified by Reynolds during the period of one year beginning July 1, 1958. Bennett agreed to furnish a competent operator and all fuel for each piece of equipment. Bennett also agreed to keep in force at all times "(s)ufficient public liability and property damage insurance to protect the R. J. Reynolds Tobacco Company against any and all claims for damage in connection with use of said equipment. . ." Reynolds agreed to pay a specified amount per hour for each piece of equipment, the operator and the fuel. For the period October 16-October 22, 1958, the

amount paid by Reynolds to Bennett under this contract exceeded $6,000.00.

The rental of such equipment upon such terms was in the regular course of Bennett's business. The equipment was operated over an extended period on the premises of Reynolds and for the benefit of Reynolds.

The Unit Backhoe was a complicated machine. Operation thereof required skill and experience. Its two clutches and seven levers required ". . . a certain rhythm, like playing a piano, to run a unit backhoe." Parrish operated the Unit Backhoe and did the field maintenance. He was a competent operator of long experience.

Parrish had worked for Bennett for nearly twenty years. Bennett paid him by the week, after first deducting taxes, insurance, and social security. Bennett gave him his W-2 form on taxes withheld by Bennett. Reynolds never paid Parrish. Parrish turned in his time to Bennett's foreman on the Brook Cove project and not to Reynolds. When Parrish wanted time off, Bennett (not Reynolds) granted such permission. He was hired by Bennett and could be fired by Bennett. Bennett's foreman checked Parrish daily and Bennett himself came around at regular intervals. Bennett ". . . wasn't interested in the work, it was the machine, more or less."

Defendants, in supplemental brief, cite and stress our decision in *Peterson v. Trucking Co.*, 248 N.C. 439, 103 S.E. 2d 479. This is in the line of decisions in which this Court has held that an interstate carrier, which exercises its franchise rights by transporting freight in leased equipment under leases providing that such equipment during the term of the lease shall be solely and exclusively under the direction and control of the lessee, is liable in damages for injuries to third parties caused by the negligent operation of such equipment in the prosecution of such carrier's business. *Wood v. Miller*, 226 N.C. 567, 39 S.E. 2d 608; *Motor Lines v. Johnson*, 231 N.C. 367, 57 S.E. 2d 388; *Eckard v. Johnson*, 235 N.C. 538, 70 S.E. 2d 488; *Hill v. Freight Carriers Corp.*, 235 N.C. 705, 71 S.E. 2d 133; *Newsome v. Surratt*, 237 N.C. 297, 74 S.E. 2d 732; *McGill v. Freight*, 245 N.C. 469, 96 S.E. 2d 438.

And, with specific reference to the Workmen's Compensation Act, this Court has held: (1) The dependents of a lessor-operator, who was transporting freight for the lessee, an interstate carrier, *under authority of the lessee's I.C.C. franchise and license plates*, were entitled to recover death benefit compensation from the lessee. *Brown v. Truck Lines*, 227 N.C. 299, 42 S.E. 2d 71. (2) The dependents of the lessor's driver, whose death occurred while operating the leased equipment *under like circumstances*, were entitled to death benefit compen-

sation from the lessee. *Roth v. McCord,* 232 N.C. 678, 62 S.E. 2d 64. (3) The dependents of an assistant driver, who was fatally injured when the leased equipment was being operated by the owner-lessor *under like circumstances,* were entitled to death benefit compensation from the lessee. *McGill v. Freight, supra.*

Reference has been made to the hybrid nature of these lease agreements. *Employment Security Comm. v. Freight Lines,* 248 N.C. 496, 501, 103 S.E. 2d 829; *Watkins v. Murrow,* 253 N.C. 652, 657, 118 S.E. 2d 5.

The bases for the decisions relating to these lease agreements are well stated by Barnhill, J. (later C.J.), in *Roth v. McCord, supra,* as follows:

"(1) Roth, at the time of his injury and death, was operating a vehicle being used by the Motor Lines to haul freight in the course of its business as a common carrier under franchise from the Interstate Commerce Commission. The vehicle was being operated under its identification plate. 'The operation of the truck was in law under the supervision and control of the interstate franchise carrier and could be lawfully operated only by those standing in the relationship of employees to the authorized carrier.' *Brown v. Truck Lines,* 227 N.C. 299, 42 S.E. 2d 71.

"(2) It is stipulated in the lease contract that while they are in the service of the Motor Lines, the vehicle and its driver shall be under the exclusive supervision, control, and direction of the lessee. The all-inclusive extent of this right of control is spelled out in the lease in detail. As the Motor Lines has contracted, so is it bound."

The bases of said decisions relating to the lease of equipment, including operator(s), to an interstate carrier for use in the exercise of its franchise rights, are not present in the case now before us.

In *Shapiro v. Winston-Salem,* 212 N.C. 751, 194 S.E. 479, the City of Winston-Salem, as sponsor of the W.P.A. project for improving Hanes Park, agreed to furnish a truck and driver, or trucks and drivers, "for an equivalent of 400 hours." While at work on said project, a city truck operated by a city employee backed into and fatally injured the plaintiff's intestate. It was held the truck driver was not, at the time the plaintiff's intestate was fatally injured, an employee of the city within the meaning of the doctrine of *respondeat superior.* The basis of decision was that the truck driver was working under the supervision and direction of the W.P.A. officials.

In *Wadford v. Gregory Chandler Co.,* 213 N.C. 802, 196 S.E. 815, the defendant rented a tractor and driver to the North Carolina Employment Relief Administration. The plaintiff alleged he was injured

by the negligence of the driver of the defendant's tractor. The evidence was to the effect that the "E.R.A. supervisor had full authority to direct the operation of the Gregory Chandler equipment, tell them what to do, when to start to work, how to do it, and where to go. . . . Mr. Matthews, the E.R.A. supervisor, directed the work; gave orders to the foreman." In a *per curiam* opinion judgment of nonsuit was affirmed on authority of *Shapiro v. Winston-Salem, supra,* and *Liverman v. Cline,* 212 N.C. 43, 192 S.E. 849.

In *Leonard v. Transfer Co.,* 218 N.C. 667, 12 S.E. 2d 729, this Court upheld a verdict and judgment in a personal injury action based on the alleged negligence of the defendant's employee while operating the defendant's truck on a public highway. The defendant had furnished the Bryant Electric Company with the truck and a driver at the price of $1.25 per hour. The Bryant Electric Company was to furnish the gas and oil and load the poles. The Bryant Electric Company had a contract with the R.E.A. and the truck was used to transport poles over the highway to the locations where the poles were to be placed. This Court held the evidence was sufficient to support a finding that the defendant retained sufficient control over the driver (his employee) to subject the defendant to liability for his negligence. This Court, in opinion by Seawell, J., said: "A person, natural or corporate, may lend or let a servant to another in such a way as to be relieved from liability arising out of injury to another through the negligence of the servant. But to bring this about, the control of the original employer over the acts of the employee must be so completely surrendered as to virtually suspend, temporarily, at least, any responsibility which might reasonably be associated with control."

In *Hodge v. McGuire,* 235 N.C. 132, 69 S.E. 2d 227, this Court upheld a verdict and judgment in a property damage action based on the alleged negligence of McGuire's employee while operating a bulldozer on plaintiffs' premises. Plaintiff Hodge had rented a bulldozer from McGuire at a rental of $10.00 per hour, which included the wages of the operator and fuel. McGuire provided the bulldozer and an experienced operator but did not go upon the Hodge premises. Hodge gave general directions as to what he wanted done in his land-clearing project but worked elsewhere and was not present when the damage occurred. While Haley, the operator, was working on it, a big red oak fell across the top of the Hodge house and caused the damages for which the action was brought. This Court held the evidence was sufficient to support a finding that the defendant retained sufficient control over the driver (his employee) to subject the defendant to liability for his negligence.

In *Hodge v. McGuire, supra,* the opinion of Johnson, J., states that the *Liverman, Shapiro,* and *Wadford* cases are factually distinguishable, and that the *Leonard* case is more nearly in point. This portion of the opinion of Johnson, J., is significant: "Here, however, it is significant that Hodge gave no direction or instruction as to the mechanical operation of the bulldozer. And, by the great weight of authority, it is held that 'a servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out to the servant the work to be done, or supervises the performance thereof, or designates the place and time for such performance, or gives the servant signals calling him into activity, or gives him directions as to the details of the work and the manner of doing it, . . .' 57 C.J.S., Master and Servant, Section 566, pp. 287 and 288." Decisions are cited, and two leading cases are discussed, *Standard Oil Co. v. Anderson,* 212 U.S. 215, 53 L. Ed. 480, 29 S. Ct. 252, and *Driscoll v. Towle,* 181 Mass. 416, 63 N.E. 922, which "illustrate the necessity of discriminating between acts of the hirer which denote authoritative control over the servant, as distinguished from mere suggestions in respect to details which amount to no more than incidental or necessary co-operation, *such as pointing out the work to be performed.*" (Our italics)

In *Jackson v. Joyner,* 236 N.C. 259, 72 S.E. 2d 589, the decision was based upon the rule that "where a servant has two masters, a general and special one, the latter, *if having the power of immediate direction and control,* is the one responsible for the servant's negligence." (Our italics) The evidence was held sufficient to support a finding that a surgeon was liable for the negligence of a nurse, a general employee of the hospital, while acting under the immediate direction and control of the surgeon during the performance of an operation. It was stated by Johnson, J.: "The power of control is the test of liability under the doctrine of *respondeat superior.*"

In *Lassiter v. Cline,* 222 N.C. 271, 22 S.E. 2d 558, and in *Harris v. Construction Co.,* 240 N.C. 556, 82 S.E. 2d 689, the evidence was held sufficient to support a finding that defendant was liable under the doctrine of *respondeat superior* for the negligence of the owner-operator of a truck engaged in hauling asphalt for the defendant at a stated price per ton.

In *Jones v. Aircraft Co.,* 251 N.C. 832, 834, 112 S.E. 2d 257, the opinion states, incident to a consideration of the exception of defendant Douglas to the court's refusal of nonsuit, that there was evidence sufficient to permit but not to compel a jury to find, *inter alia,* that "Jones, when he left Charlotte Equipment Company with the crane

to work for Boyd & Goforth, became, for the period so employed, the servant of Boyd & Goforth. *Jackson v. Joyner,* 236 N.C. 259, 72 S.E. 2d 589." However, for the reasons stated in *Jones v. Aircraft Co.,* 253 N.C. 482, 117 S.E. 2d 496, the quoted statement was not the basis of decision on first appeal.

In *Griffin v. Blakenship,* 248 N.C. 81, 102 S.E. 2d 451, the defendant had furnished a bulldozer and an operator for $10.00 an hour. This Court held the evidence insufficient to establish actionable negligence on the part of the operator. Hence, it was unnecessary to determine whether the defendant would be liable if the actionable negligence of the operator of the bulldozer had been established.

"Though well established, the loaned-servant principle has proved troublesome in its application to individual fact situations. The criteria for determining when a worker becomes a loaned servant are not precise; as a result, the state of the law on this subject is chaotic. Respectable authority for almost any position can be found, for even within a single jurisdiction the decisions are in conflict." *Nepstad v. Lambert, supra,* and decisions and articles cited therein. 57 C.J.S., Master and Servant § 566; 35 Am. Jur., Master and Servant § 541; Annotation: "Liability under respondeat superior doctrine for acts of operator furnished with leased machine or motor vehicle," 17 A.L.R. 2d 1388.

In the Restatement, Agency § 227, this appears:

"§ 227. Servant Lent to Another Master.

"A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others.

"*Comment:*

"*a. Service in relation to a specific act.* Whether or not the person lent or rented becomes the servant of the one whose immediate purposes he serves depends in general upon the factors stated in § 220 (2). Starting with a relation of servant to one, he can become the servant of another only if there are the same elements in his relation to the other as would constitute him a servant of the other were he not originally the servant of the first. Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other. It is not conclusive that in practice he would be likely to obey

the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case.

"*b. Inference that original service continues.* In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.

"*c. Factors to be considered.* A continuation of the general employment is indicated by the facts that the general employer may at any time substitute another servant, that the time of employment is short, and that the lent servant has the skill of a specialist.

"A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise permits his servant and instrumentality to assist another, is more apt to intend to surrender control."

In our view, this statement correctly sets forth the pertinent general principles and appears to be gaining widespread approval.

The subject, "Lent Employees and Dual Employment," is discussed fully in *Larson,* Workmen's Compensation Law, § 48.00. It is there stated: "When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if (a) The employee has made a contract of hire, express or implied, with the special employer; (b) The work being done is essentially that of the special employer; and (c) The special employer has the right to control the details of the work."

In discussing "Transfer of Right of Control" (§ 48.30), the author states: "The factor that seems to play the largest part in lent-employee cases is that of furnishing heavy equipment. Many cases have found continuing liability in the general employer when he furnishes operators together with road equipment, excavating equipment, steam and truck shovels, trucks, air drills, air riveters and barges. Although there are *contra* cases, the majority of the decisions have been influenced by the arguments both that the general employer would naturally reserve the control necessary to ensure that his equipment is properly used, and that a substantial part of any such operator's duties would consist of the continuing duty of maintenance of the equipment." In this connection, see *Insurors Indemnity & Insurance Co. v. Pridgen* (Tex.), 223 S.W. 2d 217, involving the rental of a "fully operated" dragline, in which it is held that the control of the machine, not the determination of what is to be done, is the decisive factor. See also, *Goodwin v. Wilhelm Steel Construction Co.* (Tex. Civ. App.), 311 S.W. 2d 510.

True, whether Parrish, if injured, would be entitled to compensation from Bennett and his insurance carrier, if any, or from Reynolds and its insurance carrier, if any, is not presented. However, the legal principles applicable in such case and in the present case would seem to bear close resemblance.

In *Mature v. Angelo*, 373 Pa. 593, 97 A. 2d 59, a closely analogous factual situation was considered. Based on decisions cited, including *Standard Oil Co. v. Anderson, supra,* and in accord with Restatement, Agency § 227, Stern, C.J., for the Supreme Court of Pennsylvania, stated "(t)he law governing tort liability arising from the negligence of a 'borrowed' employee" as follows:

"1. One who is in the general employ of another may, with respect to certain work, be transferred to the service of a third person in such a way that he becomes, for the time being and in the particular service which he is engaged to perform, an employe of that person. (citations)

"2. The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done *but also to the manner of performing it.* (citations)

"3. A servant is the employe of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually *exercises* that control or not. (citations)

"4. Where one is engaged in the business of renting out trucks, automobiles, cranes, or any other machine, and furnishes a driver or

operator as part of the hiring, there is a factual presumption that the operator remains in the employ of his original master, and, unless that presumption is overcome by evidence that the borrowing employer *in fact* assumes control of the employe's *manner of performing the work*, the servant remains in the service of his original employer. (citations)

"5. Facts which indicate that the servant remains the employe of his original master are, among others, that the latter has the right to select the employe to be loaned and to discharge him at any time and send another in his place, that the lent servant has the skill of a technician or specialist which the performance of the work requires, that the hiring is at a rate by the day or hour, and that the employment is for no definite period. (citations)

"6. The mere fact that the person to whom a machine and its operator are supplied points out to the operator from time to time the work to be done and the place where it is to be performed does not in any way militate against the continuance of the relation of employe and employer between the operator and his original master. (citations)"

Nothing in the written contract suggests that Bennett agreed to surrender or that Reynolds agreed to assume control of the Unit Backhoe or of the operator. Indeed, the provision that Bennett was to provide sufficient public liability and property damage insurance to protect Reynolds against any and all claims for damage "in connection with the use of said equipment" would seem to negative any idea that it was intended that Reynolds should assume any control whatsoever as to the manner in which the Unit Backhoe was to be operated.

Reynolds had no right to discharge Parrish. If displeased by the conduct of Parrish, the sole remedy of Reynolds was to terminate its relationship with Bennett or to require Bennett to provide a different operator.

Without repeating the evidential facts set forth above, it is sufficient to say there is evidence tending to show, in the language of *Mature* v. A*ngelo, supra*, "that this is an ordinary, typical case of the renting of a machine with an operator specially skilled for the purpose from one who is in the business of renting out such machines and operators, where neither the person renting such machine and operator, nor his own employes, are competent to run such a machine and merely direct the operator concerning the work to be done,—not the manner of performing it."

In *Nepstad v. Lambert, supra,* it appeared conclusively (as stated in syllabus by the Court) "that the special employer alone had such right of control over the act of the servant which negligently caused plaintiff's injury" and that the special employer and not the general employer was liable therefor under the doctrine of *respondeat superior.* There is no conflict between the general legal principles stated in the opinion of Christianson, J., and those set forth in Restatement, Agency § 227. The basis of decision, factual in nature, is stated as follows: "The application of these principles to the instant case compels the conclusion that Pasma, the crane operator, was under the detailed authoritative control of the Arnold company (plaintiff's employer) exclusively with respect to the act which caused the injury. Every movement of the crane while it was being used on the job was directed through hand signals by an Arnold company employe. Signals were given indicating when and how far to swing the boom of the crane, when to stop the movement, when and how far to raise or lower the boom, and when and how far to slacken or tighten the hoisting cable. Without these signals, Pasma lacked the knowledge or authority to make a move, because only Morris, the Arnold company's steel foreman, with the aid of his blueprints, knew the pattern and progress the work was to take. More detailed control can hardly be conceived. The crane operator was virtually an automatic eye which caused the machinery of the crane to respond to signals given by the Arnold company's employees."

Too, a sound distinction may exist when the operator inflicts the damage complained of by doing what the lessee directs him to do. Thus, the lessee of a backhoe and operator was held liable to the adjoining landowner when the operator as directed by the lessee removed a boundary wall. *Van Gorder v. Eastchester Estates,* 137 N.Y.S. 2d 789.

Applying the legal principles stated above, the conclusion reached is that plaintiff's evidence does not disclose affirmatively that Parrish, at the time Weaver was fatally injured, was conducting the business of Reynolds within the meaning of G.S. 97-9. Moreover, the evidence, when considered in the light most favorable to plaintiff, was sufficient to support a finding that Parrish, on the occasion of Weaver's fatal injury, was operating Bennett's Unit Backhoe in the course of and within the scope of his employment by Bennett.

For the reasons stated, the judgment of involuntary nonsuit is reversed.

Reversed.