UNITED STATES of America, Appellant,

v.

N. A. DEGERSTROM, INC., a Washington corporation, and Bower Machinery Company, Inc., Appellees.

No. 22709.

United States Court of Appeals Ninth Circuit.

March 13, 1969.

Carl Eardley, Washington, D. C. (argued), Edwin L. Weisl, Jr., Asst. Atty. Gen., John C. Eldridge, Stephen R. Felson, Attys., Dept. of Justice, Washington, D. C., Smithmoore P. Myers, U. S. Atty., Spokane, Wash., for appellant.

Lawrence Monbleau (argued), of Cashatt, Williams, Connelly & Rekofke, Spokane, Wash., for appellees.

Before HAMLEY, MERRILL and HUFSTEDLER, Circuit Judges.

HAMLEY, Circuit Judge:

N. A. Degerstrom, Inc. leased to the United States two pieces of heavy equipment, complete with operators, to be used for flood emergency work. Due to the negligence of the operator, one of these pieces of equipment, known as a Model 988 loader, was damaged during the course of the work. Degerstrom brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1964) (Act) to recover for the loss. Plaintiff alleged that, at the time of the accident, the negligent operator was the "loaned servant" of the Government.

After a non-jury trial, the district court rendered judgment for plaintiff, awarding damages in the sum of $3,430. The Government appeals, urging: (1) the trial court erred in holding that the operator of the loader was a loaned servant at the time of the accident, and (2) the trial court erred in rejecting the Government's contention that under the express terms of the written agreement, plaintiff assumed liability for the operator's negligence whether or not he was a loaned servant when the negligence occurred.

We consider first the Government's argument that the trial court erred in holding that the operator of the loader was a loaned servant at the time of the accident.

Without attempting to state the background facts in all the detail presented by the parties, we think the following is a fair statement of the factual circumstances relevant to a consideration of this argument. The Department of the Army, Army Corps of Engineers, leased the equipment, complete with operators, from plaintiff for a period of approximately fifteen days in order to perform flood emergency work near Colfax, Washington. The parties executed a written agreement covering the transaction. The specified rental for the Model 988 loader and its operator was thirty-seven dollars an hour.

The loader was to be used to remove several culverts from the south bank of the north fork of the Palouse River, and to rip-rap the south bank for a distance of about three hundred feet. The only supervisor at the work site was the Government's project supervisor, Frank L. Breckon, whose function was to direct the performance of the work.

Although the operator of the loader, Ralph McKelvy, was on the plaintiff's payroll, the hourly rental paid by the Government included enough to reimburse plaintiff for McKelvy's wages. McKelvy was a competent and experienced operator of heavy equipment and was aware of the hazards involved. There is no contention that the plaintiff was negligent in designating him as the operator, nor is it contended that the loader was defective in any respect. Despite McKelvy's general experience, he was not familiar with the type of rip-rapping involved on this job and Breckon taught him how to do this work in the desired fashion.

The accident occurred while the loader was in the bed of the stream, working in three to four feet of muddy water. Breckon motioned to McKelvy to remove a section of culvert upstream, but Mc-Kelvy did not see Breckon's hand signals. While moving upstream, McKelvy negligently caused the loader to strike a rock, causing the damage in question.

There is no quarrel between the parties as to the elements or legal significance of the loaned-servant doctrine. A concise statement of that doctrine is set out in Denton v. Yazoo & M. V. R. Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310:

> "When one person puts his servant at the disposal and under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former." (284 U.S. at 308, 52 S.Ct. at 142)

■ Under 28 U.S.C. § 1346(b), a provision of the Act, jurisdiction is conferred upon the district courts to entertain civil actions on claims against the United States for money damages for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of "any employee" of the Government under specified circumstances. In 28 U.S.C. § 2671, another provision of the Act, the term "Employee of the government" includes, among others, employees of any federal agency, and " * * * persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." As so defined, an employee of the Government could, within the meaning of the Act, be a loaned servant. See Martarano v. United States, D.C.Nev., 231 F. Supp. 805, 808. Defendant does not contend otherwise.

■ The Government correctly contends, and the trial court recognized, that federal law controls the issue of whether an individual is an "employee of the government" within the meaning of the Act. See Brucker v. United States, 9 Cir., 338 F.2d 427, 428, n. 2. However, we perceive no substantial difference between the way the federal courts and the state courts have applied the loaned-servant doctrine.

■ The critical factual inquiry in determining whether the loaned-servant doctrine should be applied is the location of the power to control the servant. As this court said in McCollum v. Smith, 9 Cir., 339 F.2d 348, 351: "responsibility is regarded as a correlative of power."

■■ In order for an employee to be a loaned servant, it is not essential that the general employer relinquish full control over his employee, or that the special employee be completely subservient to the borrower. McCollum v. Smith, at 351. Hand signals and detailed instructions by the new master suggest the power of control, but are not conclusive. See Standard Oil Co. v. Anderson, 212 U.S. 215, 226, 29 S.Ct. 252, 53 L.Ed. 480; McCollum v. Smith, at 350, 352.

■ There is nothing to indicate that the trial court did not understand these principles. Based on its appraisal of the evidence, the trial court found, in effect, that the Government actively participated in the operation of the loader and exerted detailed control over McKelvy's operations at the work site. It would follow from such a finding that McKelvy was a loaned servant at the time of the accident.

It is fair to say that this is a close factual question and that another judge, listening to the same evidence, might have been warranted in finding to the contrary. We conclude, however, that the described finding is not clearly erroneous. See McCollum v. Smith, at 351; Brucker v. United States, 9 Cir., 338 F. 2d 427.

It is therefore our opinion that the district court did not err in holding that, at the time of the accident, the operator of the loader was the loaned servant of the United States.

As noted above, the Government also contends that the trial court erred in rejecting the Government's contention that, under the express terms of the written agreement, plaintiff assumed liability for the operator's negligence whether or not he was a loaned servant when the negligence occurred.

To support this argument, the Government chiefly relies on Article 5 of the agreement, which reads as follows:

"Article 5. *Contractor's Responsibility.* The Contractor shall be responsible that his employees strictly comply with all Federal, State, and municipal laws that may apply to operations under the contract; and it is understood and agreed that the Contractor assumes full responsibility for the safety of his employees, plant, and materials and for any damage or injury done by or to them from any source or cause, except damage caused to plant or equipment by acts of the Government, its officers, agents or employees, in which event such damage will be the responsibility of the Government in accordance with applicable Federal laws."

In Article 5, the division of responsibility between the "Contractor" (plaintiff) and the Government depends on whether the person who causes the damage or injury is an "employee" of the Contractor or the Government at the time the damage or injury occurs. Since the contract does not define "employee," Article 5 offers guidance as to liability only after it is determined whether a loaned servant is an employee of the Contractor or of the Government. This is the very issue in the case; thus, Article 5, in itself, does not solve the problem of who is liable for McKelvy's negligence.

In support of its view that Article 5 should be construed as an agreement that plaintiff assumed liability for McKelvy's negligence even while the latter was a loaned servant, the Government offers several arguments. One of these is that unless this contractual provision is so construed, the Article serves no purpose because it then merely states the common law pertaining to the liability of every master for the negligence of his servant.

■ Courts strive to give meaning to every provision of a contract and would therefore avoid reading one provision as

a purposeless repetition of another. However, a provision that spells out the common law is not necessarily a purposeless repetition. Parties to contracts of this kind do not always limit their written agreement to the bare essentials necessary to deal with the problems of the particular transaction at hand. Depending upon the imagination and instincts of caution which motivate the parties and their attorneys, the contract may be, and frequently is, expanded to include recital of hornbook principles of contract law.

The Government itself characterizes the contract here in question as its "standard plant and equipment lease agreement." The agreement contains nineteen articles, many of which seem to have little application to the relatively simple kind of lease transaction here consummated. In all probability Article 5 goes into all of the Government's lease arrangements whether or not there is any prospect that there will be a loaned servant. If so, it is difficult to justify a conclusion that Article 5 was designed especially to exclude application of the loaned-servant doctrine.

■ The fact is that Article 5, which was drafted by the Government, is ambiguous on the point in issue here. One can construe it one way or the other depending upon the assumption made as to what the term "employee" means. The familiar rule of construction would seem to: contract language which is of doubtful meaning, or is susceptible of varying constructions, should be strictly construed against the person who drafted the instrument. See Caterpillar Tractor Co. v. Collins Machinery Co., 9 Cir., 286 F.2d 446, 450.

■ The Government points out that Article 13(a) provides that "the Contractor [plaintiff] will not discriminate against *any employee* because of race, etc." (Emphasis added.) Similarly, Article 12 provides that the contractor must discharge objectionable "employees." The Government correctly asserts that these provisions of the contract applied to McKelvy, even while he was a loaned servant at the work site. From this the Government reasons that if McKelvy was an "employee" of the contractor within the meaning of Articles 13(a) and 12, even while a loaned servant, he must also have been an "employee" within the meaning of Article 5, while he was a loaned servant.

We do not agree. Articles 13(a) and 12 deal only with the employees of the contractor. They establish requirements applicable to all employees without regard to whether, at certain times, they may be loaned to others. But Article 5 pertains to employees of the Government as well as employees of the contractor. Because of this, it is necessary to decide whether, as there used, a workman is, at the time he is in a loaned status, an employee of the Government or of the contractor. The use of the term "employee" in the different contexts of Articles 13(a) and 12 is not helpful in making that decision.

We therefore agree with the district court that Article 5 does not evidence an agreement of the parties to preclude application of the loaned-servant doctrine.

Affirmed.