IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-95

No. 331PA20

Filed 19 August 2022

EDWARD G. CONNETTE, as guardian ad litem for AMAYA GULLATTE, a Minor, and ANDREA HOPPER, individually and as parent of AMAYA GULLATTE, a Minor,

v.

THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY d/b/a CAROLINAS HEALTHCARE SYSTEM, and/or THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY d/b/a CAROLINAS MEDICAL CENTER, and/or THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY d/b/a LEVINE CHILDREN'S HOSPITAL, and GUS C. VANSOESTBERGEN, CRNA.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 272 N.C. App. 1 (2020), finding no error in a judgment entered on 20 August 2018 by Judge Robert C. Ervin in Superior Court, Mecklenburg County. Heard in the Supreme Court on 8 November 2021.

*Edwards Kirby, LLP, by Mary Kathryn Kurth, John R. Edwards, and Kristen L. Beightol, for plaintiff-appellants.*

*Robinson, Bradshaw & Hinson, P.A., by Matthew W. Sawchak, Jonathan C. Krisko, Stephen D. Feldman, Erik R. Zimmerman, and Travis S. Hinman; and Gallivan, White & Boyd, P.A., by Christopher M. Kelly, for defendant-appellees.*

*McGuireWoods LLP, by Mark E. Anderson, Joan S. Dinsmore, and Linwood L. Jones, for North Carolina Healthcare Association, amicus curiae.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by J. Mitchell Armbruster, for North Carolina Society of Anesthesiologists, amicus curiae.*

MORGAN, Justice.

¶ 1        Plaintiffs petitioned this Court for discretionary review of the unanimous opinion rendered by the Court of Appeals in *Connette ex rel. Gullatte v. Charlotte-Mecklenburg Hospital Authority*, 272 N.C. App. 1 (2020), in which the lower appellate court found no error in the trial court's exclusion of evidence proffered by plaintiffs at trial in an effort to show that defendant VanSoestbergen breached the professional duty of care which governed his participation in the preparation and administration of a course of anesthesia which resulted in profound injuries being suffered by plaintiff Amaya Gullatte. The trial court's evidentiary ruling, and the Court of Appeals' affirmance of it, was dictated by the application of the principle entrenched by *Byrd v. Marion General Hospital*, 202 N.C. 337 (1932) and its progeny which categorically establishes that nurses do not owe a duty of care in the diagnosis and treatment of patients while working under the supervision of a physician licensed to practice medicine in North Carolina. *Id.* at 341–43. Due to the evolution of the medical profession's recognition of the increased specialization and independence of nurses in the treatment of patients over the course of the ensuing ninety years since this Court's issuance of the *Byrd* opinion, we determine that it is timely and appropriate to overrule *Byrd* as it is applied to the facts of this case. Accordingly, we reverse and remand this matter to the trial court for further proceedings consistent with this opinion.

## I.     Factual and Procedural Background

On 11 September 2010, an emergency room visit for an upper respiratory infection revealed that three-year-old Amaya Gullatte was tachycardic, prompting Amaya's pediatrician to refer the child to a cardiologist. The cardiologist's examination of Amaya disclosed that the youngster was plagued by the heart disease known as cardiomyopathy, an affliction which enlarges the heart and makes it difficult for the heart to pump blood correctly. The cardiologist recommended the performance of an "ablation procedure" on Amaya's heart in order to address the disorder. The child was admitted to a Carolinas Medical Center facility on 20 October 2010, where an anesthetics team consisting of anesthesiologist James M. Doyle, M.D. and Certified Registered Nurse Anesthetist (CRNA) Gus C. VanSoestbergen utilized a mask to administer the anesthetic sevoflurane to Amaya prior to the surgical procedure. Shortly after she was induced with the sevoflurane, Amaya went into cardiac arrest. Although the introduction of resuscitation drugs and the performance of cardiopulmonary resuscitation (CPR) by Dr. Doyle was able to revive Amaya, still the approximately thirteen minutes of oxygen deprivation which was experienced by the child resulted in the onset of permanent brain damage, cerebral palsy, and profound developmental delay. Plaintiff Edward Connette, as Amaya's guardian ad litem, and plaintiff Andrea Hopper, as Amaya's mother, filed a lawsuit against Dr. Doyle, CRNA VanSoestbergen, the Charlotte-Mecklenburg Hospital Authority, and

two additional physicians who treated Amaya.

¶ 3        The trial spanned three months and concluded in February 2016. While the jury returned a verdict in favor of the two additional treating physicians, the jury failed to reach a verdict on the claims against Dr. Doyle and CRNA VanSoestbergen. Dr. Doyle and his anesthesiology practice proceeded to settle plaintiffs' claims against them.

¶ 4        A second trial commenced in May 2018, in which plaintiffs asserted a number of claims based on negligence against CRNA VanSoestbergen and the hospital as VanSoestbergen's employer. In plaintiffs' opening statement during the second trial, their counsel referenced a leading pharmacology textbook's description of a process known as intravenous introduction of etomidate, which was depicted as a safer alternative to the method of introducing sevoflurane through the usage of a mask into a patient who has cardiomyopathy. Witnesses testified that Dr. Doyle, in his capacity as the anesthesiologist for the procedure, and CRNA VanSoestbergen, in his respective role as the nurse anesthetist for the surgery, collaborated on Amaya's plan as both medical professionals independently and identically determined that sevoflurane mask induction was the appropriate course of action to implement. CRNA VanSoestbergen concurred with Dr. Doyle's final decision to order this method of the introduction of the anesthetic into Amaya's system after the two consulted with one another about the plan. While the ultimate decision to order the chosen

anesthesiological procedure rested with the physician Dr. Doyle, the certified registered nurse anesthetist VanSoestbergen advised the physician, agreed with the physician, and participated with the physician in the election and administration of the anesthetic sevoflurane through a mask.

Plaintiffs were prepared to present evidence through certified registered nurse anesthetist Dean Cary acting as an expert witness on the manner in which CRNA VanSoestbergen's formulation of, affirmation of, and contribution to the decision to administer sevoflurane to Amaya by utilizing the mask induction procedure rather than by utilizing an intravenous method to induce anesthesia, allegedly breached the professional standard of care applicable to VanSoestbergen. However, the trial court determined that the introduction of evidence regarding a professional standard of care which should apply to VanSoestbergen in his capacity as a certified registered nurse anesthetist was precluded by *Daniels v. Durham County Hospital Corp.*, 171 N.C. App. 535 (2005), *disc. rev. denied*, 360 N.C. 289 (2006), a case which directly applied this Court's holding in *Byrd* to govern the outcome in *Daniels* and which the trial court, in turn, directly applied to the present case. Specifically, the trial court prohibited the introduction of testimony from plaintiffs' expert witness Cary which would have tended to show that the standard practice of CRNAs under the medical facts of Amaya's case would have expressly prohibited the course of action followed by CRNA VanSoestbergen. If allowed by the trial court to do so, the expert would

have testified that an intravenous introduction of a drug other than sevoflurane, such as etomidate, would have complied with the applicable professional standard of care for a certified registered nurse anesthetist like VanSoestbergen, while the use of sevoflurane mask induction in this instance would breach the applicable professional standard of care. In its ruling which excluded this aspect of evidence from the testimony rendered by the expert witness Cary, the trial court observed that a nurse may be liable for independent actions taken against a plaintiff but could not be held liable for planning and selecting the appropriate anesthesia technique because nurses operate under the compulsory supervision of physicians licensed to practice medicine.

¶ 6     On 17 July 2018, pursuant to North Carolina General Statutes Section 1A-1, Rule 48, the parties stipulated on the record to the validity of a trial verdict rendered by nine or more jurors. The jury returned a verdict in favor of VanSoestbergen and, correspondingly, his hospital employer, and the trial court entered judgment memorializing the jury's verdict on 20 August 2018. Plaintiffs appealed, among other matters, the trial court's exclusion of plaintiffs' proffered expert testimony regarding CRNA VanSoestbergen's involvement in the determination and implementation of the allegedly negligent anesthesia plan as a claimed breach of the applicable professional standard of care. On 16 June 2020, the Court of Appeals affirmed the trial court's exclusion of the evidence at issue in a unanimous decision. *Connette*, 272

N.C. App. at 5, 13. Plaintiffs filed a Petition for Discretionary Review of the lower appellate court's determination, and this Court allowed the petition on 10 March 2021.

## II.     Analysis

A trial court's determination as to the admissibility of evidence, particularly when such admissibility is called into question on the issue of relevance, is generally reviewed for abuse of discretion. *See, e.g.*, *State v. Williams*, 363 N.C. 689, 701–02 (2009), *cert. denied* 562 U.S. 864 (2010); *State v. Jacobs*, 363 N.C. 815, 823 (2010). The trial court's exclusion of plaintiffs' proffered testimony in the case sub judice was governed by the application of *Daniels v. Durham County Hospital Corp.*, 171 N.C. App. at 538–40, in which the Court of Appeals properly implemented the unequivocal holding in *Byrd* that nurses did not owe an independent duty to patients in the selection and planning of treatment. The existence of a duty of care between a defendant and a plaintiff is a question of law. *See Pinnix v. Toomey*, 242 N.C. 358, 362 (1955); *see generally Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 225–26 (2010) (reciting elements of negligence, including duty of care). "We review questions of law de novo." *State v. Graham*, 379 N.C. 75, 2021-NCSC-125, ¶ 7 (quoting *State v. Khan*, 366 N.C. 448, 453 (2013)). A trial court's determination of the admissibility of evidence which depends dispositively upon its conclusion regarding a question of law is likewise reviewed de novo. *See e.g.*, *Da Silva v. WakeMed*, 375 N.C.

1, 4–5 (2020).

**A. Substantive Law**

¶ 8      Medical malpractice actions in North Carolina are negligence claims upon which the Legislature has seen fit to erect extra statutory requirements—both substantive and procedural—which a plaintiff must satisfy in order to sustain such allegations. *Turner v. Duke Univ.*, 325 N.C. 152, 162 (1989) (explaining that medical malpractice actions require a plaintiff to offer competent evidence of "(1) the standard of care, (2) breach of the standard of care, (3) proximate causation, and (4) damages"); *see* N.C.G.S. § 1A-1, Rule 9(j) (2021) (requiring dismissal of medical malpractice complaints which do not include one of three enumerated averments). Medical malpractice actions are prescribed by a specific set of enactments found in Article 1B of Chapter 90 of the North Carolina General Statutes. N.C.G.S. §§ 90-21.11 to -21.19B (2021). A medical malpractice action is defined as a "civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider." *Id.* § 90-21.11(2)(a). The statute expressly contemplates medical malpractice actions against registered nurses for professional services rendered in the performance of "medicine," "nursing," providing "assistance to a physician," and other types of health care listed therein. *Id.* § 90-21.11(1)(a). In order to sustain a medical malpractice action, it is a plaintiff's burden to establish by the greater weight

of the evidence that a defending party breached its duty of care by exhibiting professional conduct which was "not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action." *Id.* § 90-21.12(a). Therefore, these statutes collectively create the requirement of registered nurses to act in accordance with applicable and appropriate standards of practice and establish the burden of proof which a plaintiff must satisfy in order to demonstrate that a registered nurse has violated the expected applicable professional standard of care.

¶ 9    Upon this Court's issuance of the *Byrd* decision in 1932, nurses have not been subject to culpability for the performance of their roles in the administration of any negligent treatment of a patient and could only be held liable for the execution of their primary function within the medical community, which was to "obey and diligently execute the orders of the physician or surgeon in charge of the patient, unless, of course, such order was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result." *Byrd*, 202 N.C. at 341. While a nurse could be held liable for *how* nursing duties were executed outside the supervision of a physician, it was clear from *Byrd* that a nurse could not be held liable for *what* the nurse did to "diligently execute the orders of the physician." *Id.* at 341–

43. In *Byrd*, this Court was asked to answer the legal question: "What duty does a nurse owe to a patient?" *Id.* at 341. In responding to this query, we reasoned that "[n]urses are not supposed to be experts in the technique of diagnosis or the mechanics of treatment"; instead, "the law contemplates that the physician is solely responsible for the diagnosis and treatment of his patient." *Id.* at 341–42. Thus, a nurse could only be held liable for the negligent treatment of a patient when (1) the nurse acted without direction from and outside the presence of a physician, and thus without the requisite "acquiescence and implied approval of the physician," or (2) the nurse was undertaking to carry out a physician's order that "was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result." *Id.* at 343, 341. As a result, nurses were largely exempted from the existence of any applicable professional standard of care, because nurses were deemed by *Byrd* to be sheltered from exposure to liability for negligence when performing duties under the supervision of a physician and were only vulnerable to negligence claims due to the performance of their professional duties and responsibilities when substandard execution of such nursing expectations was obvious.

North Carolina was the first state in the nation to regulate the registration of practicing nurses with the creation of The Board of Examiners of Trained Nurses of North Carolina in 1903. Act of Mar. 3, 1903, ch. 359, 1903 N.C. Pub. Laws 58b (captioned An Act to Provide for the Registration of Trained Nurses). By the time that

*Byrd* was decided almost thirty years later, the regulation of nursing was still confined to the examination and licensure of applicants who wished to use the title "trained," "graduate," "licensed," or "registered" nurse. N.C. Code Ann. §§ 6729, 6734, 6738 (Michie 1935). Licensure did not become a prerequisite to practice nursing generally until 1965. Act of May 18, 1965, ch. 578, § 1, 1965 N.C. Sess. Laws (Reg. Sess. 1965) 624, 624 (captioned An Act to Rewrite and Consolidate Articles 9 and 9A of Chapter 90 of the General Statutes with Respect to the Practice of Nursing). In 1932, applicants for registration with the Board, which had been renamed The Board of Nurse Examiners of North Carolina, were required to be at least twenty-one years of age, of good moral character, a high school graduate, and either a graduate of a school of nursing or one who had practiced nursing in another state under similar registration requirements. N.C. Code Ann. §§ 6731, 6733 (Michie 1935). The Board of Nurse Examiners was empowered with the authority to conduct periodic examinations "in anatomy and physiology, materia medicia, dietetics, hygiene, and elementary bacteriology, obstetrical, medical and surgical nursing, nursing of children, contagious diseases and ethics in nursing, and such other subjects as may be prescribed by the examining board." *Id.* § 6732. The examination fee totaled ten dollars, *id.*, and the Board possessed the power to revoke a registered nurse's license for cause pursuant to notice and hearing requirements, *id.* § 6737. Despite the sweeping authority which was vested in the North Carolina Board of Nurse

Examiners as the importance and influence of nurses within the field of medicine grew, nonetheless the express and specific identification of a nurse's role of legal responsibility within the medical industry remained undefined by any statutory enactment of the Legislature. Consequently, by way of the *Byrd* decision, this Court filled this legal culpability vacuum with the pronouncement that a nurse could only "be held liable in damages for any failure to exercise ordinary care" when working outside of the immediate supervision of a physician or when the treatment ordered by the physician was "obviously negligent or dangerous." *Byrd*, 202 N.C. at 343.

¶ 11     The nursing profession has evolved tremendously over the ninety years since *Byrd*. Since 1965, *all* persons practicing as nurses in North Carolina must be licensed by the North Carolina Board of Nursing (the Nursing Board) as either a "registered nurse" or "licensed practical nurse." Ch. 578, § 1, 1965 N.C. Sess. Laws at 625, 628–29; N.C.G.S. § 90-171.43 (2021). The Nursing Board is empowered to adopt, amend, repeal, and interpret rules pursuant to North Carolina's Nursing Practice Act, a comprehensive enactment regulating the nursing profession found in Chapter 90, Article 9A of the North Carolina General Statutes. *See* N.C.G.S. § 90-171.23(b) (2021) (listing the Board's duties and powers).

¶ 12     With particular regard to registered nurses in the state, the Legislature has defined the "practice of nursing by a registered nurse" as having ten components:

>     a. Assessing the patient's physical and mental health, including the patient's reaction to illnesses and treatment

regimens.

b. Recording and reporting the results of the nursing assessment.

c. *Planning, initiating, delivering, and evaluating appropriate nursing acts.*

d. Teaching, assigning, delegating to or supervising other personnel in implementing the treatment regimen.

e. *Collaborating with other health care providers in determining the appropriate health care for a patient but, subject to the provisions of G.S. 90-18.2, not prescribing a medical treatment regimen or making a medical diagnosis, except under supervision of a licensed physician.*

f. *Implementing the treatment and pharmaceutical regimen prescribed by any person authorized by State law to prescribe the regimen.*

g. Providing teaching and counseling about the patient's health.

h. Reporting and recording the plan for care, nursing care given, and the patient's response to that care.

i. Supervising, teaching, and evaluating those who perform or are preparing to perform nursing functions and administering nursing programs and nursing services.

j. Providing for the maintenance of safe and effective nursing care, whether rendered directly or indirectly.

*Id.* § 90-171.20(7) (2021) (emphases added).

¶ 13 The Nursing Board has further refined the scope of nursing practice. The profession's practice has evolved to include (1) the assessment of nursing care needs resulting in the "[f]ormulation of a nursing diagnosis," (2) developing care plans

which include the determination and prioritization of nursing interventions, and (3) implementing nursing activities. Components of Nursing Practice for the Registered Nurse, 21 N.C. Admin. Code 36.0224 (2021). When a registered nurse "assumes responsibility directly or through delegation for implementing a treatment or pharmaceutical regimen," the nurse becomes accountable for "anticipating those effects that may rapidly endanger a client's life or well-being." License Required, *id.* 36.0221(c)(7) (2021). Lastly, the Nursing Board also oversees the additional licensure of certain types of registered nurses for specialized roles; namely, Certified Registered Nurse Anesthetist, Certified Nurse Midwife, Clinical Nurse Specialist, and Nurse Practitioner. These categories of advanced practice registered nurses must all obtain additional education and certifications to practice in their respective recognized, specific, and unique specialties. N.C. Bd. of Nursing, *APRN Requirements At-A-Glance*, https://www.ncbon.com/myfiles/downloads/licensure-listing/aprn/advance-practice-at-a-glance.pdf (last visited Aug. 4, 2022) (listing licensure requirements for Advanced Practice Registered Nurses); 21 N.C. Admin. Code 36.0120(6), 36.0226, 36.0228, 36.0801–.0817 (2021).

¶ 14    Pursuant to the statutory grant of rulemaking power afforded to it in N.C.G.S. § 90-171.23(b), the Nursing Board has defined the practice of a certified registered nurse anesthetist as the performance of "nurse anesthesia activities *in collaboration with a physician*, dentist, podiatrist, or other lawfully qualified health care provider."

Nurse Anesthesia Practice, 21 N.C. Admin. Code 36.0226(a) (emphasis added). The rules further expound upon this collaboration as

> a process by which the certified registered nurse anesthetist works with one or more qualified health care providers, each contributing his or her respective area of expertise consistent with the appropriate occupational licensure laws of the State and according to the established policies, procedures, practices, and channels of communication that lend support to nurse anesthesia services and that define the roles and responsibilities of the qualified nurse anesthetist within the practice setting.

*Id.* 36.0226(b). Such collaboration between a physician and a registered nurse such as a CRNA is contemplated to include "participating in decision-making and in cooperative goal-directed efforts." Components of Nursing Practice for the Registered Nurse, *id.* 36.0224(g)(2). Depending on "the individual's knowledge, skills, and other variables in each practice setting," CRNAs are expressly allowed to (1) select and administer preanesthetic medications, (2) select, implement, and manage general anesthesia consistent with the patient's needs and procedural requirements, and (3) initiate and administer several palliative and emergency medical procedures. *Id.* 36.0226(c)–(d). It is clear that CRNAs must fulfill these duties under the supervision of a licensed physician. N.C.G.S. § 90-171.20(7)(e). But, it is also apparent that the independent status, the professional stature, the individual medical determinations, and the shared responsibilities with a supervising physician have grown in significance and in official recognition since *Byrd* for a nurse such as a certified

registered nurse anesthetist.

**B. Historical Application**

¶ 15        Amidst this growing authority and influence which have been wielded by members of the nursing profession during the span of ninety years since this Court issued the *Byrd* decision, the state's appellate courts have applied *Byrd* with increasing strain. In *Blanton v. Moses H. Cone Memorial Hospital, Inc.*, this Court did not apply *Byrd* as a bar to a plaintiff's claims against a nurse, but utilized *Byrd* to reiterate that a plaintiff's claim against a nurse is valid "if the plaintiff can prove an agent of the hospital followed some order of the doctor which" was "so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient by the execution of such order." 319 N.C. 372, 376 (1987) (quoting *Byrd*, 202 N.C. at 341).

¶ 16        Several years after *Blanton*, this Court was presented with "the opportunity to test the liability of a surgeon for the negligence of operating room personnel under the borrowed servant rule." *Harris v. Miller*, 335 N.C. 379, 388 (1994). In *Harris*, the plaintiff sued an orthopedic surgeon for medical malpractice under a theory of vicarious liability, alleging that the physician was responsible pursuant to the doctrine of *respondeat superior* for a CRNA's negligent administration of anesthesia while the nurse was under the physician's direct supervision during a surgical procedure. *Id.* at 383. The trial court entered a directed verdict in favor of the

physician after finding that the plaintiff had failed to establish a master-servant relationship between the independent physician and the CRNA who was employed by the hospital where the physician performed the surgery. The Court of Appeals affirmed the trial court's decision. Although this Court "held that the Court of Appeals erred in affirming the trial court's directed verdict for Dr. Miller on plaintiff's vicarious liability claim" and "reverse[d] and remand[ed] for a new trial on this claim," *id.* at 400, nonetheless, this Court, in its decision in *Harris*, offered observations which were not expressly focused on *Byrd* but still served to dilute the efficacy of the foundation which has undergirded *Byrd*. In examining the relevant case law concerning the existence of employer-employee relationships in the context of supervising surgeons and the operating room personnel who participate in a surgical procedure, this Court identified the pivotal nature of the application of the *Byrd* approach in the resolution of *Harris*. The seminal case on the issue presented in *Harris*—*Jackson v. Joyner*, 236 N.C. 259 (1952)[1]—had given rise to a judicially created "presumption that the surgeon in charge controls all operating room personnel," which would inure to the benefit of the plaintiff in *Harris* by establishing a per se determination of liability on the part of the physician for the negligence of the nurse under the physician's supervision. 335 N.C. at 388–89. While the Court reasoned that the presumption "may have been appropriate in an era in which

---

[1] *Jackson* has been effectively overruled by *Harris*. *See Harris*, 335 N.C. at 391.

hospitals undertook only to furnish room, food, facilities for operation, and attendance" and "in which only physicians had the expertise to make treatment decisions," the Court concluded that such a presumption "is no longer appropriate in this era." *Id.* at 389 (extraneity omitted) (citing *Byrd*, 202 N.C. at 341–42, for the proposition concerning the exclusive expertise of physicians making treatment decisions). The *Harris* Court in 1994 noted that since the issuance of *Jackson* in 1952, hospitals had transformed into treatment centers and now exercised "significant control over the manner in which their employees, including staff physicians, provide treatment." *Id.* at 390. With this acknowledgment, the Court opined that "it is no longer appropriate" to presume that a hospital which has hired its own employees, such as nurses, cedes control over them to a supervising physician under a traditional "borrowed employee" analysis simply because the hospital had assigned the nurse to be directly supervised by an independent surgeon. *Id.* at 389–90. While *Jackson* derived its presumption "from the mere fact that [the defendant] was the 'surgeon in charge,' " this paradigm of the physician fully controlling a supervised nurse and all other medical personnel involved in a surgical procedure, resulting in the physician's ultimate responsibility for each medical contributor's actions in conjunction with the surgery, "no longer reflects . . . . [p]resent[-]day hospitals." *Id.* at 389 (quoting *Rabon v. Rowan Mem'l Hospital, Inc.*, 269 N.C. 1, 11 (1967)). The Court stressed this medical field evolution with the further recognition in *Harris*, which we find particularly

relevant in the instant case which we now decide twenty-eight years later:

> [S]urgeons are no longer the only experts in the operating room. The operating team now includes *nurses*, technicians, interns, residents, *anesthetists*, anesthesiologists and other specialized physicians. *All of these are experts in their own fields, having received extensive training both in school and at the hospital.* When directed to perform their duties, they do so without further instruction from the surgeon, relying instead on their own expertise regarding the manner in which those duties are performed. Some of them, like anesthesiologists and technicians, may have expertise not possessed by the surgeon. Thus, the surgeon will in some cases be ill-equipped, if not incapable, of controlling the manner in which assisting personnel perform their duties.

*Id.* at 390–91 (emphases added) (citations omitted).

¶ 17          Although the Court made these observations in *Harris* concerning the antiquated view of the total subservience of a nurse and other members of a medical team to a supervising physician, nonetheless, the Court's resolution of the vicarious liability claims in *Harris* based upon the specific analysis of the tort's elements regarding the doctrine of *respondeat superior* and the accompanying "borrowed servant" doctrine allowed *Byrd* to retain its precedential status on the distinguishable legal issue of a nurse's inability to be held liable on a theory of negligence for acts performed under the supervision of a physician. With *Byrd* remaining intact as controlling authority on this issue, the Court of Appeals followed this case precedent in determining *Daniels* in 2005. In *Daniels*, the plaintiffs brought legal action against the defendant hospital upon the death of their baby who died seven months after

suffering injuries which the plaintiffs alleged were sustained during their daughter's delivery at the hospital. 171 N.C. App. at 536–37. In their lawsuit against the hospital and the mother's private physician who performed the baby's delivery, as well as other individuals that included two of the hospital's nurses who were involved in the delivery, the plaintiffs alleged that the defendants were jointly and severally liable on the bases of negligence and medical malpractice for the baby's injuries and subsequent death. *Id.* at 537. In affirming the trial court's entry of summary judgment for the hospital on the plaintiffs' claim that the delivery nurses failed to oppose the doctor's decision to perform the delivery as the physician directed, the Court of Appeals stated:

> [P]laintiffs' evidence is not sufficient to meet the standard set forth in *Byrd v. Marion Gen. Hosp.*
>
> Under *Byrd*, a nurse may not be held liable for obeying a doctor's order unless such order was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient from the execution of such order or performance of such direction. The Court stressed that the law contemplates that the physician *is solely responsible* for the diagnosis and treatment of his patient. Nurses are not supposed to be experts in the technique of diagnosis or the mechanics of treatment.
>
> Although these principles were set out more than 70 years ago, they remain the controlling law in North Carolina. Plaintiffs refer repeatedly to the responsibilities of the "delivery team" and argue for a collaborative process with joint responsibility. While medical practices, standards, and expectations have certainly changed since

> 1932 [when the Supreme Court of North Carolina decided
> *Byrd*] and even since 1987 [when the Supreme Court of
> North Carolina decided *Blanton*], this Court is not free to
> alter the standard set forth in *Byrd* and *Blanton*.

*Id.* at 538–39 (extraneity omitted).

¶ 18 Just as it did in its opinion in *Daniels*, the Court of Appeals in the present case likewise recognized that it was bound by the governing, albeit obsolescent, approach articulated in *Byrd* regarding a nurse's blanket lack of exposure to liability for negligence when acting under the direction of a supervising physician. In its issued opinion in this matter, the lower appellate court assessed plaintiffs' claim "that VanSoestbergen breached the applicable standard of care by agreeing, during the anesthesia planning stage, to induce Amaya with sevoflurane using the mask induction procedure." *Connette*, 272 N.C. App. at 4. The Court of Appeals went on to further detail the specific contentions of plaintiffs:

> Plaintiffs asserted that certified registered nurse anesthetists are highly trained and have greater skills and treatment discretion than regular nurses. Moreover, they asserted, nurse anesthetists often use those skills to operate outside the supervision of an anesthesiologist. Plaintiffs also argued that VanSoestbergen was even more specialized than an ordinary nurse anesthetist because he belonged to the hospital's "Baby Heart Team" that focused on care for young children.

*Id.* at 4–5.

¶ 19 In its thorough analysis, the Court of Appeals began with the trial court's recognition of our decision in *Daniels*, which in turn was premised on our decision in

*Byrd*, as the trial court excluded plaintiffs' proffered expert testimony in support of their claim against defendant VanSoestbergen that the CRNA "breached a standard of care by agreeing to mask inhalation with sevoflurane." *Id.* at 5. The Court of Appeals explained that "[t]he trial court concluded that a nurse may be liable for improperly administering a drug, but not for breaching a duty of care for planning the anesthesia procedure and selecting the appropriate technique or drug protocol." *Id.*

The lower appellate court continued its examination by citing *Byrd*, observing that "[n]early a century ago, a plaintiff sought to hold a nurse liable for decisions concerning diagnosis and treatment." *Id.* The Court of Appeals attributed guidance from *Byrd* in recalling notable principles from our opinion in that case:

> Our Supreme Court declined to recognize the plaintiff's legal claim [in *Byrd*], explaining that "nurses, in the discharge of their duties, must obey and diligently execute the orders of the physician or surgeon in charge of the patient." The Court held that the "law contemplates that the physician is solely responsible for the diagnosis and treatment of his patient. Nurses are not supposed to be experts in the technique of diagnosis or the mechanics of treatment."

*Id.* at 6 (quoting *Byrd*, 202 N.C. at 341–42). Upon remarking that "[s]ince *Byrd*, this [c]ourt repeatedly has rejected legal theories and claims based on nurses' decisions concerning diagnosis and treatment of patients," *id.*, the lower appellate court replicated the type of language which it employed in *Daniels* in rendering the

following observations as the Court of Appeals determined that the trial court did not

commit error:

> In short, as this [c]ourt repeatedly has held in the last few decades, trial courts (and this [c]ourt) remain bound by *Byrd*, despite the many changes in the field of medicine since the 1930s. Thus, the trial court properly determined that Plaintiffs' claims based on VanSoestbergen's participation in developing an anesthesia plan for Amaya are barred by Supreme Court precedent.
>
> We acknowledge that Plaintiffs have presented many detailed policy arguments for why the time has come to depart from *Byrd*. We lack the authority to consider those arguments. We are an error-correcting body, not a policy-making or law-making one. And, equally important, *Byrd* is a Supreme Court opinion. We have no authority to modify *Byrd*'s comprehensive holding simply because times have changed. Only the Supreme Court can do that.

*Id.* (extraneity omitted).

## C. Revisiting *Byrd*

¶ 21    Having explored the evolution of the nursing industry in North Carolina in the

context of the medical field's promotion of, and deference to, the independent abilities

of nurses, coupled with the North Carolina appellate courts' concomitant recognition

of this shift in the nine decades since *Byrd* as a nurse's legal culpability appropriately

has grown commensurate with professional responsibility, this Court deems it to be

opportune to implement its observations articulated in *Harris* and to ratify the

appropriateness intimated in *Daniels* and the present case by the Court of Appeals

to revisit *Byrd* in light of the increased, influential roles which nurses occupy in medical diagnosis and treatment. We hold that even in circumstances where a registered nurse is discharging duties and responsibilities under the supervision of a physician, a nurse may be held liable for negligence and for medical malpractice in the event that the registered nurse is found to have breached the applicable professional standard of care. To the extent that this Court's decision in *Byrd v. Marion General Hospital* establishes a contrary principle, we reverse *Byrd*. We expressly note that our decision in the present case does not disturb in any way the principle enunciated in *Byrd* that "nurses, in the discharge of their duties," when they "obey and diligently execute the orders of the physician or surgeon in charge of the patient," may be held liable when "such order was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient from the execution of such order or performance of such direction." 202 N.C. at 341.

With the reversal of this Court's holding in *Byrd* and its progeny which systematically prevented a registered nurse from being liable for the negligent execution of nursing duties and responsibilities which were performed under the auspices of a supervising physician, we are mindful to avoid any intrusion upon the exclusive authority of the Legislature to reach complex policy judgments and consequently to enact statutory laws which are consistent with these determinations

with regard to the creation of new causes of action or theories of liability. While the Legislature established the standard for recovery in civil actions for damages for personal injury or death in medical malpractice claims against registered nurses through the collective enactment of N.C.G.S. §§ 90-21.11 through 90-21.19B, nonetheless, the law-making body has been silent regarding further enactments which refine or interpret this body of statutory law. As we earlier noted, the finite principle of law in *Byrd* which we overturn in the instant case was instituted by this Court in the dearth of any express and specific decree from any empowered authority which addressed the manner and extent of a registered nurse's legal culpability in situations wherein such a nurse is subject to negligence and medical malpractice claims. Because we established the legal principle at issue in *Byrd* and no intervening enactment or policy has emerged to change it, we are properly positioned to reverse *Byrd* without treading upon the Legislature's domain as we fulfill this Court's charge to interpret the law.

## III.   Conclusion

This Court recognizes the impracticalities and inconsistencies of the ongoing application of the disputed and outdated principle in *Byrd* to the realities of the advancement of the field of medicine with regard to the ascension of members of the nursing profession to statuses within the medical community which should appropriately result in an acknowledgement of their elevated station and their

commensurate elevated responsibility. The expanding authority, recognition, and independence of nurses, which have steadily evolved as these professionals, exemplified by those who have achieved identified specializations and certifications, have sufficiently risen within the ranks of the field of medicine to earn levels of autonomy and influence which formerly were fully withheld. Pursuant to N.C.G.S. § 90-171.20(7), registered nurses now have the ability, *inter alia*, to collaborate with other health care providers in determining the appropriate health care for a patient; to implement the treatment and pharmaceutical regimen prescribed by any person authorized by state law to prescribe the regimen; and to plan, initiate, deliver, and evaluate appropriate nursing acts. As a certified registered nurse anesthetist, defendant VanSoestbergen in the instant case is a beneficiary of these heightened responsibilities which have been accorded to registered nurses and, with these heightened powers and the autonomy recognized by law come heightened responsibilities recognized by law.

¶ 24　　　The trial record developed in this case indicates that the trial court excluded from evidence the proffered testimony of plaintiffs' witness who was available to render expert testimony concerning CRNA VanSoestbergen's alleged breach of the applicable professional standard of care. While the application of *Byrd* has previously operated to prevent the admission into evidence of such testimony pursuant to this Court's announced principle in *Byrd* that nurses cannot be held liable for the

discharge of their duties when obeying and diligently executing the orders of a supervising physician due to the physician's sole responsibility for the diagnosis and treatment of the patient, our reversal of this principle, as espoused in *Byrd*, compels a new trial. Accordingly, the trial court's exclusion of plaintiffs' expert testimony is reversed, and this case is remanded to the Court of Appeals for further remand to the trial court for a new trial.

REVERSED AND REMANDED.

Justice ERVIN and Justice BERGER did not participate in the consideration or decision of this opinion.

Justice BARRINGER dissenting.

The issue before this Court is whether a certified registered nurse anesthetist (CRNA) who collaborates with a doctor to select an anesthesia treatment can be liable for negligence in the selection of that treatment. Since 1932, this Court has held no, and the legislature has never required otherwise. In judicially changing this standard, the three-justice majority appears to create liability without causation— allowing a nurse to be held liable for negligent collaboration in the treatment ultimately chosen by the physician. Such a policy choice should be made by the legislature, not merely three Justices of this Court. Accordingly, I respectfully dissent.

## I.    Factual Background

Plaintiffs are the guardian ad litem and the mother of the juvenile who was injured in this case. The juvenile suffered from a serious case of dilated cardiomyopathy, a heart disease. Due to the juvenile's serious heart conditions, her cardiologist recommended the juvenile undergo a radiofrequency ablation procedure to try to regulate her heart rhythm. A doctor, who is not a party to this case, prepared an anesthesia treatment plan for the procedure. The anesthesia treatment plan was to administer sevoflurane through inhalation induction and then switch to an intravenous induction after the juvenile was asleep. Defendant, a CRNA, assisted with the procedure, collaborating with the doctor on the treatment plan and helping

to administer the anesthetic. The doctor testified that as the doctor "it is my responsibility" to develop and prescribe the anesthesia treatment, though he and defendant CRNA had independently reached the same conclusion regarding which anesthesia treatment plan to use.

¶ 27        After the juvenile received the sevoflurane, her heart rate started dropping significantly. The doctor provided resuscitation drugs and performed chest compressions for approximately twelve-and-a-half minutes. During that time, the juvenile suffered oxygen deprivation to her brain, resulting in cerebral palsy and global developmental delay. Plaintiffs sued defendants for negligence.

¶ 28        At trial, the trial court held that only a doctor, not a nurse, can be liable for the selection of an anesthesia treatment under *Daniels v. Durham County Hospital Corp.*, 171 N.C. App. 535 (2005). Accordingly, plaintiffs were prohibited from admitting evidence concerning whether defendant CRNA breached a duty of care by failing to recommend a different anesthetic drug or better administration technique. The trial court concluded that evidence of a better anesthesia treatment was not relevant under Rule 401 of the North Carolina Rules of Evidence because it did not make some fact material to the case more or less likely to be true. At the conclusion of the trial, the jury found that the juvenile was not injured by defendant CRNA's negligence.

¶ 29        Plaintiffs appealed, arguing that the trial court erred by granting defendants' motion to exclude the evidence of a better anesthesia treatment. However, the Court

of Appeals held that the trial court properly allowed defendants' motion to exclude evidence that defendant CRNA breached the applicable standard of care by agreeing to induce the juvenile with sevoflurane using inhalation since the doctor, not the nurse, was responsible for selecting an anesthesia treatment under *Daniels. Connette v. Charlotte-Mecklenburg Hosp. Auth.*, 272 N.C. App. 1, 4–6 (2020). Further, despite plaintiffs' policy arguments that the practice of medicine had evolved beyond *Daniels,* rendering it obsolete, the Court of Appeals held that it was bound by *Daniels* because *Daniels* followed this Court's decision in *Byrd v. Marion General Hospital*, 202 N.C. 337 (1932). *Connette*, 272 N.C. App. at 6. Thus, the Court of Appeals found no error in the trial court's ruling. *Id.* at 6–7.

Plaintiffs then petitioned this Court, asking us to allow discretionary review of the case to address whether *Byrd* is still good law. Despite the fact that two members of this Court were recused in this case, review was allowed.

## II. Standard of Review

"We review relevancy determinations by the trial court de novo before applying an abuse of discretion standard to any subsequent balancing done by the trial court." *State v. Triplett*, 368 N.C. 172, 175 (2015). Thus, "[a] trial court's rulings on relevancy are technically not discretionary, though we accord them great deference on appeal." *State v. Lane*, 365 N.C. 7, 27 (2011).

### III.    Analysis

¶ 32    "It is axiomatic that only relevant evidence is admissible at trial, while irrelevant evidence is inadmissible." *State v. Hembree*, 368 N.C. 2, 16 (2015). Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2021).

¶ 33    Here, the trial court held that the evidence of defendant CRNA's ability to suggest an alternative anesthesia treatment was inadmissible under Rule 401 because it was not relevant to whether defendant CRNA was liable for breaching the standard of care. *Daniels* took its holding from this Court's decision in *Byrd*. *Daniels*, 171 N.C. App. at 538. *Byrd* "stressed that '[t]he law contemplates that the physician *is solely responsible* for the diagnosis and treatment of his patient,' " *id.* (alteration in original) (quoting *Byrd*, 202 N.C. at 341–42), and so held that "nurses, in the discharge of their duties, must obey and diligently execute the orders of the physician or surgeon in charge of the patient, unless . . . such order was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient from the execution of such order or performance of such direction," *Byrd*, 202 N.C. at 341. Therefore, in accordance with *Byrd*, the Court of Appeals in *Daniels*

rejected plaintiffs' request to hold the nurse liable "for a collaborative process with joint responsibility." *Daniels*, 171 N.C. App. at 539.

¶ 34        *Byrd* also recognized that obviously in the absence of instruction from a physician, a nurse who undertakes to administer treatment when the physician is not present "will be held liable in damages for any failure to exercise ordinary care." *Byrd*, 202 N.C. at 343. However, "if the physician is present and undertakes to give directions, or, for that matter, stands by, approving the treatment administered by the nurse, unless the treatment is obviously negligent or dangerous, as hereinbefore referred to, then in such event the nurse can then assume that the treatment is proper under the circumstances, and such treatment, when the physician is present, becomes the treatment of the physician and not that of the nurse." *Id.*

¶ 35        Plaintiffs do not dispute that, under *Byrd*, evidence of a better anesthesia treatment was not relevant because the doctor, not defendant CRNA, bore the sole responsibility for the selection of which treatment should be used. After all, if a doctor's inaction while observing a nurse select a treatment does not waive that doctor's sole responsibility for the selection of that treatment, *see id.*, then that doctor's collaboration with the nurse in selecting the treatment likewise cannot waive the doctor's exclusive responsibility. Nor do plaintiffs argue that the anesthesia treatment chosen in this case "was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient" from it. *Id.*

Instead, plaintiffs' sole arguments are that *Byrd* and its progeny should be overturned or limited to their facts.

¶ 36     "This Court has never overruled its decisions lightly." *Rabon v. Rowan Mem'l Hosp., Inc.*, 269 N.C. 1, 20 (1967) "The salutary need for certainty and stability in the law requires, in the interest of sound public policy, that the decisions of a court of last resort affecting vital business interests and social values, deliberately made after ample consideration, should not be disturbed except for most cogent reasons." *Potter v. Carolina Water Co.*, 253 N.C. 112, 117–18 (1960) (quoting *Williams v. Randolph Hosp., Inc.*, 237 N.C. 387, 391 (1953)). Accordingly, this Court faithfully adheres to the "doctrine of stare decisis which proclaims, in effect, that where a principle of law has become settled by a series of decisions, it is binding on the courts and should be followed in similar cases." *State v. Ballance*, 229 N.C. 764, 767 (1949) (emphasis omitted).

¶ 37     Admittedly "[t]he rule of stare decisis, though one tending to consistency and uniformity of decision, is not inflexible." *Hertz v. Woodman*, 218 U.S. 205, 212 (1910) (emphasis omitted); *see also Patterson v. McCormick*, 177 N.C. 448, 456 (1919) (quoting *Hertz*, 218 U.S. at 212). For instance, "the doctrine of stare decisis should never be applied to perpetuate palpable error." *State v. Mobley*, 240 N.C. 476, 487 (1954) (emphasis omitted). "Nor should stare decisis be applied where it conflicts with a pertinent statutory provision to the contrary." *Id.* (emphasis omitted). "[W]here a

statute covering the subject matter has been overlooked, the doctrine of stare decisis does not apply." *Id.* (emphasis omitted). However, no such justification exists in this case to depart from our longstanding precedent in *Byrd*.[1]

¶ 38        Plaintiffs contend that *Byrd* conflicts with a pertinent statutory provision and thus should be overruled. Specifically, plaintiffs reference N.C.G.S. § 90-21.12(a), which states, in relevant part:

> [I]n any medical malpractice action as defined in [N.C.]G.S. [§] 90-21.11(2)(a), the defendant health care provider shall not be liable for the payment of damages unless the trier of fact finds by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action . . . .

N.C.G.S. § 90-21.12(a) (2021). "Where the language of a statute is clear, the courts must give the statute its plain meaning . . . ." *Frye Reg'l Med. Ctr., Inc. v. Hunt*, 350 N.C. 39, 45 (1999). Looking to the plain language of N.C.G.S. § 90-21.12(a), nothing in the statute indicates that it is providing an exhaustive list of every situation in which a health care provider may be liable. Instead, N.C.G.S. § 90-21.12(a) functions

---

[1] While the majority argues that *Harris v. Miller*, 335 N.C. 379 (1994), weakened *Byrd*, *Harris* cited *Byrd* once in an offhanded comment and then did not mention it again in the opinion. *Id.* at 389. *Harris* never engaged in a serious examination of the merits or reasoning of *Byrd* or further addressed it. Thus, *Harris* cannot be interpreted as affecting *Byrd*'s precedential value.

as a general liability limitation such that, regardless of other circumstances, a health care provider cannot be liable *unless* certain criteria are met; namely, unless the provider failed to act in accordance with the standard of care set forth in the statute. However, nowhere does N.C.G.S. § 90-21.12(a) state that no other limitations might apply to certain categories of health care providers or exempt them from liability in specific situations. Thus, the holding in *Byrd*, which functions as a specific limitation on the liability of nurses when treating or diagnosing patients, does not conflict with N.C.G.S. § 90-21.12(a).

¶ 39     Furthermore, N.C.G.S. § 90-21.12(a) is a broad statute that provides a general rule applicable to all health care providers. A more specific and thus more relevant statute to the issue in this case is N.C.G.S. § 90-171.20(7), which defines the scope of practice for nurses. Subsection 90-171.20(7) sets forth the "10 components" of "[t]he 'practice of nursing by a registered nurse.' " N.C.G.S. § 90-171.20(7) (2021). The fifth and sixth components are relevant to this case. The fifth component is "[c]ollaborating with other health care providers in determining the appropriate health care for a patient but, subject to the provisions of [N.C.]G.S. [§] 90-18.2,[2] not prescribing a medical treatment regimen or making a medical diagnosis, except under supervision

---

[2] Section 90-18.2 applies specifically to nurse practitioners but does not expand their liability beyond the limits set forth in N.C.G.S. § 90-171.20(7). While N.C.G.S. § 90-18.2 provides that nurse practitioners may take certain actions, it explicitly notes that the "supervising physician shall be responsible for authorizing" those actions. N.C.G.S. § 90-18.2 (2021).

of a licensed physician." N.C.G.S. § 90-171.20(7)(e). The sixth component is "[i]mplementing the treatment and pharmaceutical regimen prescribed by any person authorized by State law to prescribe the regimen." N.C.G.S. § 90-171.20(7)(f).

¶ 40 Pursuant to the fifth and sixth components, a registered nurse's practice does not include prescribing or implementing a medical treatment or making a medical diagnosis unless under the supervision of a physician. The language in N.C.G.S. § 90-171.20(7)(e) and (f) thus incorporates the holding of *Byrd*, "that the physician is solely responsible for the diagnosis and treatment of his patient," *Byrd*, 202 N.C. at 341–42, but a nurse may administer treatment when the "physician . . . stands by, approving the treatment[,]" *id.* at 343. As a result, the General Statutes do not conflict with *Byrd* but are indeed consistent with it.

¶ 41 Additionally, while plaintiffs cite the regulations governing CRNAs passed by the North Carolina Board of Nursing, these regulations do not provide for a liability different than *Byrd*. A regulation passed by an administrative body cannot create a liability that is not authorized by statute. *Rouse v. Forsyth Cnty. Dep't of Soc. Servs.*, 373 N.C. 400, 407 (2020) ("[A]n administrative agency has no power to promulgate rules and regulations which alter or add to the law it was set up to administer or which have the effect of substantive law." (cleaned up)).

¶ 42 Further, the regulations' language does not support plaintiffs' argument. Certainly, 21 N.C. Admin. Code 36.0226(b) recognizes that there will be collaboration,

defined as "a process by which the [CRNA] works with one or more qualified health care providers, each contributing his or her respective area of expertise," and states that an "individual [CRNA] shall be accountable for the outcome of his or her actions." 21 N.C. Admin. Code 36.0226(b) (2020). Additionally, 21 N.C. Admin. Code 36.0226(c) notes that one of the responsibilities of a CRNA includes "selecting, implementing, and managing general anesthesia." 21 N.C. Admin. Code 36.0226(c). However, these clauses are limited by the scope of practice provision in the first subsection of 21 N.C. Admin. Code 36.0226(a), which provides that

> [o]nly a registered nurse who completes a program accredited by the Council on Accreditation of Nurse Anesthesia Educational Programs, is credentialed as a [CRNA] by the Council on Certification of Nurse Anesthetists, and who maintains recertification through the Council on Recertification of Nurse Anesthetists, shall perform nurse anesthesia activities in collaboration with a physician, dentist, podiatrist, or other lawfully qualified health care provider. *A [CRNA] shall not prescribe a medical treatment regimen or make a medical diagnosis except under the supervision of a licensed physician.*

21 N.C. Admin. Code 36.0226(a) (emphasis added). Once again, this regulation is consistent with the holding of *Byrd*, prohibiting CRNAs from prescribing treatments or making medical diagnoses, except under the supervision of a licensed physician.

¶ 43     Finally, plaintiffs argue that *Byrd* conflicts with the law of joint and several liability because it does not permit both a doctor and nurse to be held liable for the same injury. Joint and several liability, however, does not determine whether a

defendant is liable for negligence. "To recover damages for actionable negligence, a plaintiff must establish (1) a legal duty, (2) a breach thereof, and (3) injury proximately caused by such breach." *Mozingo by Thomas v. Pitt Cnty. Mem'l Hosp., Inc.*, 331 N.C. 182, 187 (1992) (cleaned up). Joint and several liability simply determines how a plaintiff recovers once he proves that two or more defendants meet the definition of actionable negligence for the same injury. *See Beanblossom v. Thomas*, 266 N.C. 181, 186–87 (1966). Under *Byrd*, however, plaintiffs cannot establish that a nurse acts negligently in collaborating on a treatment plan with a doctor. Therefore, the threshold requirement for reaching joint and several liability, that two or more parties be negligent, was never met. Accordingly, *Byrd* does not conflict with joint and several liability.

¶ 44     Still, plaintiffs contend that due to developments in medicine, *Byrd* is now obsolete and should be overruled. However, adhering to the principles of stare decisis, this Court should not disturb settled precedent that clearly defines the liability of doctors and nurses when treating or diagnosing patients. Of course, the legislature, which is not bound by stare decisis, could have at any time in the last ninety years enacted a different rule of liability to account for changes in the medical profession. As summarized previously, it did not. Neither the General Statutes nor the regulations governing CRNAs conflict with *Byrd*'s holding. Indeed, even the majority recognizes that under the current regulatory framework, nurses remain under the

supervision of a licensed physician. Thus, even if a nurse's collaboration is negligent, the fact that the physician makes the ultimate care decision means that the nurse's negligence would not be the proximate cause of any injury. Therefore, plaintiffs' arguments that *Byrd* should be overruled or limited to its facts are not persuasive.

¶ 45        Furthermore, as we recognized in *Parkes v. Hermann,* 376 N.C. 320 (2020), creating a new form of liability involves making "a policy judgment [that] is better suited for the legislative branch of government." *Id.* at 326. In this case, departing from *Byrd* by expanding nurse liability would require us to determine which nurses' training and responsibilities are so advanced or specialized as to warrant liability and which nurses, if any, remain not liable under *Byrd*. Neither the statutes nor caselaw provide a clear guideline for making this determination. Further, dramatically expanding liability requires the type of factor weighing and interest balancing that are quintessential policy determinations for the legislature to make, not the courts. *See Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169–70 (2004). For instance, under this new standard, nurses may now need malpractice insurance. Regardless of this Court's view on whether expanding CRNA liability is a beneficial policy, "[t]he legislative department is the judge, within reasonable limits, of what the public welfare requires, and *the wisdom of its enactments is not the concern of the courts*." *State v. Warren*, 252 N.C. 690, 696 (1960) (emphasis added). "As to whether an act is good or bad law, wise or unwise, is a question for the Legislature and not for the

courts — it is a political question." *Id.*

¶ 46        It appears that the majority's newly created theory holds CRNAs liable if they negligently collaborate with their supervising physician in choosing a treatment plan. Left unanswered is what constitutes adequate collaboration or what happens when the physician and CRNA disagree. The uncertainty created by the majority's new standard highlights why such policy decisions should be left to the legislature, not this Court.

¶ 47        The legislature, as the policy making body of our government, has adopted and codified the holdings in *Byrd* in its statutes and regulations rather than supplanting them. Thus, the majority's holding not only overturns this Court's precedent without sufficient cause but also ignores the plain language of the statutes and regulations. In doing so, three Justices of this Court substitute their judgment of the public welfare for that of the General Assembly and create instability in the medical profession by striking down ninety years of precedent without providing a discernible standard.

## IV.    Conclusion

¶ 48        Both the General Statutes and the regulations governing CRNAs are consistent with the holdings in *Byrd*. Legal responsibility for treatment and diagnoses lies with the physician alone, not with nurses. As a result, the trial court correctly found that evidence of whether an alternative anesthetic treatment plan

should have been used was not relevant to the liability of defendant CRNA. No justification exists to depart from our prior holdings, especially when doing so involves policymaking beyond the authority of this Court, creates more questions than it answers, and is adopted by less than a majority of this Court. Accordingly, I respectfully dissent.

Chief Justice NEWBY joins in this dissenting opinion.